Memorandum of Decision
Joshua S., then only two months old, was a miraculous survivor of the June, 1999 murder-suicide of his parents and the murder of two of his three siblings. Two families, both well-intentioned and well-qualified, now compete for the right to be his custodian and ultimately his adoptive parents. The Department of Children and Families (DCF) placed Joshua with the V. family soon after the incident and now seeks to have Joshua remain with them permanently. The P. family claims Joshua by virtue of their status as named guardians in ;the matching wills of the S. parents. For the reasons stated below, this court now names the V. parents as Joshua's custodian and grants DCF's motion to be appointed statutory parent for the purposes of facilitating Joshua's adoption by the V.'s.
BACKGROUND
In the early morning hours of June 10, 1999, Kelly S., a thirty-one year old woman with a long history of bipolar disorder, suicide attempts, and psychiatric treatment, stabbed her husband Charles S. to death in the bedroom of their East Hartford home. Kelly then began stabbing her nine year old daughter Jessica. After pouring gasoline over Jessica, herself, and another bedroom, Kelly S. set the house on fire. Jennifer S., who was nearly three, and Jonah S., one and one-half years old, died in the conflagration.
Jessica somehow managed to escape and run across the street to the home of Chad and Sara P., whom she knew well. Sara P. awoke to screams for CT Page 10341 help and a blaze of fire coming toward her house. Sara recognized the person as Jessica, threw water on her, and had her roll on the front lawn to put out the fire in her hair. Chad called 911. Sara soon noticed blood all over herself and Jessica. She learned that Jessica had been stabbed and applied first aid. In the meantime, the P.'s five year old son, Caleb, awakened to see the fire, the blood, and the unfolding horror. The P.'s second child, twenty-month old Rachel, fortunately slept through the night.
Fire, police, and other emergency personnel soon arrived. Sara told the firemen where the members of the S. family slept. Shortly thereafter, firemen brought Jonah, lifeless, out on a stretcher. They would later find the bodies of Jennifer, Charles, and Kelly. At some point, a fireman rescued Joshua from the inferno and carried him out of the house. Joshua looked black and was not moving. The fireman laid him on the front lawn and applied CPR. The fireman then yelled "I got him." Orphaned by the tragedy, Joshua had survived.
DCF immediately became involved because Jessica and Joshua were victims of an attempted murder by their mother, were homeless, and were seriously injured. DCF obtained an ex parte order of temporary custody on June 11, 1999 while the two children remained in the hospital. Also on June 11, DCF learned that the police had found a will in the S. home that named Chad and Sara P. as guardians of the children. At a hearing on June 18, the juvenile court sustained the temporary custody order. When the children were discharged from the hospital on June 22, DCF placed Joshua in the temporary care of Aldo and Lisa V., a newlywed couple in their late twenties and early thirties who, particularly in Aldo's case, had been close friends with Kelly S. DCF placed Jessica in a separate foster home with the intention of eventually reunifying her with Frank P., her biological father who lived in Minnesota.[2]
On July 28, 1999, the court adjudicated Joshua a neglected and uncared for child. The court granted two petitions to intervene in the dispositional stage. The first was filed by the Aldo and Lisa V. The second was filed by Chad and Sara P., who alleged that they were named the legal guardians of both surviving children in the S.'s mirror wills.
The probate court admitted both wills to probate in decisions rendered on September 30 and October 8, 1999. The court rejected arguments made by the V. family that Sara and particularly Chad P., who is the assistant pastor of the Truth Baptist Church, of which the S.'s were members, had used undue influence to persuade the S.'s to name them in their wills as guardians for their children.
In the meantime, DCF had moved in juvenile court to be appointed CT Page 10342 statutory parent and for that court to retain jurisdiction for approval of an eventual adoption. Due to the pendency of the case in juvenile court, the probate court declined to act on the appointment of a guardian for Joshua. The testamentary guardians moved to dismiss the case in juvenile court on the ground that that court lacked jurisdiction. On October 28, 1999, the juvenile court, Keller, J., denied the motion to dismiss. The basis of Judge Keller's ruling was that, in In re JuvenileAppeal (85-BC), 195 Conn. 344, 366, 488 A.2d 790 (1985), the Supreme Court had ruled that the Superior Court has exclusive jurisdiction over custody-guardianship matters, such as the one in question, that arise from a neglect petition.
Judge Keller indicated that the question of who should become Joshua's custodian should be decided in the dispositional phase of the neglect proceeding. Judge Keller also reserved decision on DCF's motion for appointment as statutory parent on the ground that the outcome of the dispositional hearing would determine whether such appointment was necessary. The case then came to the Child Protection Session for a dispositional hearing on the neglect petition and a hearing on the statutory parent application. Trial of these matters took seven full court days between July 31 and August 8, 2000.[3]
THE NEGLECT DISPOSITION
 A. The Burden of Proof
This case lies at the crossroads of probate court and juvenile court. A threshold issue in this unique situation is the burden of proof. Prior to trial, this court ruled, as had Judge Keller, that there was a presumption that placement of Joshua with the P.'s, who are the testamentary guardians, was in Joshua's best interest. At the outset of trial, this court ruled that the presumption may be rebutted by showing, by a preponderance of the evidence rather than clear and convincing evidence, that it would be detrimental to the child to permit the named testamentary guardians to serve as such. This court added that the presumption could be rebutted without having to show that the named guardians were unfit.
This court adheres to these rulings. General Statutes § 45a-596
provides in pertinent part that "[t]he surviving parent of any minor may be will appoint a person or persons who shall be guardian or coguardians of the person of such minor, a guardian or coguardians of the estate or both." In Bristol v. Brundage, 24 Conn. App. 402, 589 A.2d 1 (1991), the Appellate Court held that General Statutes § 45a-596(a) should be interpreted as "mandating the appointment of the sole surviving parent's testamentary choice of a guardian because it should be presumed that the CT Page 10343 best interests of the child are served by that appointment." Id., 406.[4] The court stated that "[t]his presumption, like that of 46b-56b, may be rebutted only by a showing that it would detrimental to the child to permit the named testamentary guardian to serve as such." Id.[5] TheBristol court did add that, in the case before it, there was no evidence that the named guardian was unfit. This discussion was dictum, however, because the defendants, who opposed the testamentary guardianship, introduced no evidence of any quantum to refute the presumption favoring the testamentary guardian. Id., 406-07.
In Doe v. Doe, 244 Conn. 403, 710 A.2d 1297 (1998), the Supreme Court helped resolve the issue of whether it is necessary to prove unfitness to rebut the presumption. The Doe court held that the presumption in §46b-56b in favor of a parent over a a nonparent in any custody dispute "does not mean that the nonparent must, in order to rebut it, prove that the parent is unfit." Id., 455. See note 5 supra. For two reasons, this ruling applies to challenges to testamentary guardians under §45a-596(a). First, as noted above, the Appellate Court in Bristol
specifically stated that the presumption of § 45a-596(a) is "like that of 46b-56b." Bristol v. Brundage, supra, 24 Conn. App. 406. See also id. ("The purpose of 45a-596(a) is best served by affording to the testamentary choice of the surviving parent a presumption similar to that of 46b-56b."). Second, the burden of challenging a testamentary guardian, has a constitutional right to raise his or her child. SeeStanley v. Illinois, 405 U.S. 645, 651 (1972). Given that under Doe a person challenging a parent's right to custody does not have to prove parental unfitness, it follows that a person challenging a testamentary guardian's right to custody does not have to prove unfitness either. In short, "[s]o long as due regard is given to the presumption, . . . the best interests standard remains the ultimate basis of a court's custody decision." (Internal quotation marks omitted.) Doe v. Doe, supra,244 Conn. 455.
The standard of proof to overcome the presumption should be preponderance of the evidence and not, as claimed by the testamentary guardians, clear and convincing evidence. The present case combines aspects of both a neglect disposition hearing and a child custody case. In either event, the burden would be preponderance of the evidence. See Practice Book § 34-3(b) (neglect); Mallory v. Mallory, 207 Conn. 48,51-54, 539 A.2d 995 (1988), and Cookson v. Cookson, 201 Conn. 229,239-40, 514 A.2d 323 (1986) (child custody). The higher clear and convincing standard normally applies as a result of statutory or constitutional mandate in cases involving rights of biological parents. See Santosky v. Kramer, 455 U.S. 745, 769-70 (1982); General Statutes § 17a-112 (c) and Practice Book § 34-3(c) (termination of parental rights); General Statutes § 45a-610 (removal of parent as CT Page 10344 guardian). There is no similar authority for applying it here.[6]
Accordingly, DCF and the V. interveners bear the burden of proving by a "preponderance of the evidence that placement with Chad and Sara P., who are the testamentary guardians, would be detrimental to Joshua. Because DCF seeks to have the court vest the personal custody of Joshua in the V. family as the disposition of the neglect adjudication, DCF must show that that family is "suitable and worthy of such responsibility. . . ." General Statutes § 46b-129(j). In a neglect dispositional hearing such as this one, the court may consider events occurring through the close of the trial. Practice Book § 33-5.
B. Application of the Burden of Proof
The court's application of the burden of proof may be summarized as follows. DCF mishandled this case and did not give the P. family the benefit of the presumption that it was in Joshua's best interest to place him there. Had DCF placed Joshua with the P. family or even investigated the P. family in the early stages of this case, it would or at least should have found them to be fit, suitable, and worthy custodians for Joshua. DCF instead placed Joshua with the V. family and opposed his transfer to the P.'s. Fortunately for Joshua, Aldo and Lisa V. have been wonderful parents. Because over one year later Joshua has prospered and has become closely attached to Aldo and Lisa, and because Joshua is at some risk for mental illness or disorder if exposed to additional trauma in his life, it would be detrimental to Joshua to transfer him to the testamentary guardians at this point.
1. The Events of June 10, 1999 through October, 1999
DCF claims to have eliminated the P.'s from consideration early on for one reason: that they did not come forward soon enough to express clearly an interest in assuming Joshua's custody.[7] The petitioners[8] rely on evidence that neither Chad nor Sara rode with Jessica in the ambulance to the hospital at 2:00 a.m. on June 10 and did not visit Jessica and Joshua at the hospital frequently. The petitioners also claim that Chad P. told several authorities at the children's hospital in the first few days after the tragedy that he was not available to take the children and that, on June 16, 1999, he told a DCF investigator in a phone call that he was not able to take the children due to the way they died. The petitioners additionally contend that Chad P. told a DCF program supervisor on the telephone on June 22, the day that the children were discharged from the hospital and placed in other foster homes, that he might be able to take Joshua but he was not really sure.
The claim that the P.'s did not attend to and visit Jessica and Joshua CT Page 10345 quickly and sufficiently deserves little weight. Chad and Sara P. helped save the lives of these two children. On the night of June 10, they found themselves in a veritable triage situation in which they had to deal at the same time with the physical and emotional well-being of themselves, their own young children, and Jessica and Joshua. They were understandably traumatized for a week or more by the blood, the fire, the deaths of their friends, the loss of two young children, and the horrible way that they had perished. They were besieged with inquiries from the fire and police departments, from friends, neighbors, and members of their church, and, ultimately, the media.
Despite being awake since 1:00 a.m. and having the obligation to prepare a special church service for the S. family that evening, Chad P. visited Jessica at the hospital on June 10. Joshua at the time was in Massachusetts General Hospital. Chad visited Jessica again the next day. On June 12, Chad formally learned from the lawyer for the S. estate that he and his wife had been named as guardians.[9] On June 14, Chad and Sara attended the S. family wake for several hours. The funeral was private and the P.'s were not invited.
On June 16, Chad returned a phone call from a DCF investigator. Chad confirmed that the S.'s had named his wife and him as guardians in their will. Beyond that, the contents of the "conversation are disputed. Chad testified that he told the investigator that he was ambivalent about taking the surviving S. children. The investigator's notes report Chad to have stated that he was not able to take the children due to the way in which the parents had died. Curiously, the investigator's typewritten report on the conversation does not appear in the June 16 entries in the DCF log book (or "narrative"), but instead appears on June 23, after the next disputed conversation with DCF, which will be discussed below. In any event, there is no disagreement that the P.'s did not clearly request to take custody of either of the surviving S. children by June 16.
Around this time, Chad visited Jessica again at the hospital. Jessica asked him whether be wanted to see Joshua, who by then had been transferred to the same hospital. Chad and Jessica then visited Joshua, who was sleeping at the time.
On or about June 17, after Chad had spoken to the DCF investigator, Chad called DCF "to find out about a scheduled court hearing. Chad went to the courthouse on June 18 for the preliminary hearing on the order of temporary custody. Although he could not have entered the courtroom because he was not a party, he attempted to meet outside the courtroom with family members and with a lawyer or court official involved in the case to find out more about it. Even though he informed them that he was a named guardian of the children, he was rebuffed and asked to leave. CT Page 10346 Ironically, inside the courtroom, an Assistant Attorney General representing DCF had just informed the court that DCF was aware of the will and the fact that a family had been named as guardians, but that "[t]hey were approached by the department and they've indicated they do not want to take custody of the children."
Sara P. did not visit Jessica and Joshua at the hospital before June 19. Sara and Chad had temporarily moved out of their house because of the blood, soot, and smell of gasoline that had scarred it. Chad and Sara both had difficulty eating and sleeping for several days after the tragedy. Five year old Caleb thought of blood whenever he saw the color red and had many questions about the deaths of his friends and, in the case of the S. children, his playmates.
On June 19 or 20, Chad and Sara visited Jessica at the hospital. They then went in to see Joshua. After a minute or so, a nurse entered the room and asked them to leave. Chad explained to no avail that they were the named guardians in the will. Although the P.'s were on the visiting list for Jessica, for some reason the hospital had left them off the visiting list for Joshua.
It is in this context that Chad P. had the disputed phone conversation with a DCF program supervisor on June 21 or 22.[10] Both Chad and the program supervisor took contemporaneous handwritten notes of the conversation. On July 28, 1999, slightly more than a month after the conversation, the DCF case worker filed in court a social study, which the same program supervisor had approved, stating that "DCF learned on 6/22/99, that the Ps have changed their minds and stated their intentions to pursue custody of Joshua and not Jessica."
On June 20, 2000, the program supervisor received a deposition subpoena from a lawyer for the P. family that specifically required her to produce her contemporaneous notes as well as all her other reports at a forthcoming deposition. On the morning of July 7, 2000, the day of the scheduled deposition, the program supervisor intentionally destroyed her contemporaneous handwritten notes. She instead compiled and, at the deposition, submitted a typewritten version of her notes. The typewritten version reports that, in the June 22, 1999 phone conversation, Chad asked DCF to reconsider its plan to place the children with other families "that day because he had a meeting scheduled with his lawyer that afternoon. Reportedly, Chad also stated that he thought he could do well with Joshua but that he was not sure. According to the typewritten version, the supervisor asked Chad when he had changed his mind and decided that he wanted to become a placement option for the children. Chad purportedly stated that he had done so the day before. CT Page 10347
In court, the program supervisor testified consistently with her typewritten notes. The case worker testified in court that her July 28, 1999 statement in the social study that the P.'s had decided to pursue custody of Joshua was a "misunderstanding." In contrast, Chad P. testified that he made clear to the supervisor in the June 22, 1999 conversation that he intended to pursue guardianship for both children as provided in the will.
The court credits the testimony of Chad P. concerning this conversation. The fact of the matter is that DCF destroyed the best evidence of this conversation and now disclaims the next best evidence, which is the social study that it filed in court. DCF's attempts to destroy and then revise the contemporaneous evidence of the conversation fully justify discrediting its witnesses on this point. Indeed, DCF's actions concerning this matter are highly improper and call for decisive corrective measures.
The P.'s did indeed speak to a lawyer around that time, but the lawyer could not take their case due to a conflict of interest. DCF agrees that, on July 12, 1999, one of the present lawyers for the P. family contacted the case worker to inform her that the P.'s intended to intervene in the case in order to pursue custody. DCF did not oppose the motion to intervene which, as stated above, the court granted on July 28, 1999.
In mid-July, 1999, Sara P. contacted DCF to request visits with the S. children. DCF agreed to that request and to several subsequent requests. The pattern became one of supervised visits with Joshua twice a month.[11] In early October, Sara asked DCF for more frequent visits. DCF declined. Later that month, Judge Keller ordered that visitation by the P.'s with Joshua take place twice a week for an hour at a time, alternating between the V. home and the P. home. These visits have continued through the present time.
2. Analysis of These Events
In analyzing these facts, it is fair to start with the proposition that, while DCF ordinarily has a statutory obligation to make reasonable efforts to reunite neglected or abused children with their biological parents, see General Statutes § 17a-112(c)(1), it has no comparable statutory obligation to unite children with testamentary guardians. In addition, DCF apparently did not have any internal policies that addressed the unusual facts of this case.[12] DCF had also received advice from a psychologist at the children's hospital that any placement of Joshua should be as permanent as possible to minimize his exposure to further trauma. Thus, when DCF placed Joshua with Aldo and Lisa V. on CT Page 10348 June 22, 1999, it intended to do so permanently and not give further consideration to the P. family's interest in taking custody.
In this respect, DCF erred. Since at least 1991, the case law in our state has provided that "[General Statutes §] 45a-596 (a) should be interpreted as mandating the appointment of the sole surviving parent's testamentary choice of a guardian because it should be presumed that the best interests of the child are served by that appointment." Bristol v.Brundage, supra, 24 Conn. App. 406. Although this court certainly does not expect social workers to uncover this case law, the uniqueness and importance of this case should have compelled DCF workers to seek legal advice and motivated DCF's lawyers to discover and assess the significance of this resumption.
DCF did not give Chad and Sara P. the benefit of this presumption. Instead, DCF treated this matter as a single elimination race to the finish line. When the P.'s did not unequivocally express an interest in taking custody on June 16, and did not spend long hours at the hospital visiting, DCF eliminated them from the competition. DCF gave the P.'s no special status, which they were entitled to under the will, but instead treated them the same as many of the other nonrelative families that DCF considered briefly as possible placements during this time period. DCF gave no consideration to the reasons that the P.'s responded as they did, to the trauma they suffered themselves, to the efforts that they did make, and to the rejections they had experienced in trying to become more involved. DCF essentially treated the order of temporary custody as the final rather than the first stage of its neglect case.
Further, it was improper for DCF to reject the P.'s based on a single phone conversation with a DCF investigative worker. Such a phone conversation is not a valid means of waiving important testamentary rights. Although testamentary guardians do not have the legal status of biological parents, it bears noting that a court cannot accept a consensual termination of parental rights from a biological parent unless it finds that "(1) upon clear and convincing evidence, the termination is in the best interest of the child and (2) such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child." General Statutes § 17a-112 (b). At the very least in this case, DCF should have obtained a formal, written waiver before ruling the P. family out.
DCF then did not give the P.'s a meaningful second chance. Even if one accepts DCF's version of the June 22 phone conversation, DCF was on notice that the P.'s had changed their mind to some degree, that they were seeking legal advice, and that they had some interest in taking Joshua. Such a message should have persuaded DCF to investigate the CT Page 10349 possibility of placement with the P. family rather than conclude, as it did, that it was too late. Yet DCF never scheduled an interview of the P.'s, never did a record check, never did a home assessment, and never, until perhaps the trial, learned what the P. family had experienced in the previous twelve days. DCF agreed only to very limited visitation. Thus, other than the mistaken belief that the P. family had ruled itself out, DCF neither sought nor obtained any reliable evidence by July, 1999 addressing the issue of whether it would have been detrimental to place Joshua with the testamentary guardians.[13]
3. The Psychological Evaluation and Other Information
On August 17, 1999, DCF moved for a psychological evaluation of the P.'s. On October 28, 1999, Judge Keller granted the motion and ordered that the psychologist evaluate the V. family as well. The evaluation was conducted in December, 1999 and January, 2000 with a commendable care and competence by Dr. Ann Phillips, a licensed psychologist. The petitioners rely on the results of that examination to argue that, even in June, 1999, the V. family was a better fit for Joshua than the P. family.
Dr. Phillips found both couples to be warm, compassionate, mentally stable, fit, and effective as parents. She did identify several areas of concern that favored the V. family. The first was that the V. family opposed corporal punishment while the P. family, based on its strict adherence to the Christian Bible, did believe in using a paddle or "rod of correction" as one of many tools to discipline children in appropriate circumstances. This issue is of some significance because DCF regulations prohibit foster and prospective adoptive parents from using corporal punishment. Thus, if the P.'s had gained custody of Joshua, they would have had to treat him differently than their other children, at least until they adopted him, which might have created some friction among the children in that household. On the other hand, there was no evidence that Chad and Sara P. had ever physically harmed their children through corporal punishment. On the contrary, the evidence established that the P.'s had used corporal punishment in a thoughtful, constructive, and sensitive way. See Cobble v. Commissioner of Department of SocialServices, 430 Mass. 385, 719 N.E.2d 500 (1999) (punishment of a child with a belt does not necessarily constitute abuse under Massachusetts civil child protection law).
A second area of concern was that the P.'s were not as "psychological-minded" as the V.'s. This matter was important because Joshua may be susceptible to mental disease or disorder and he will one day have to learn the full and tragic story of how he lost most of his natural family. Aldo and Lisa V. were unquestionably attuned to the need for therapeutic intervention, in part because they both have graduate CT Page 10350 level educations and professional experience in counseling and social work. Dr. Phillips found that Chad and Sara P., while not opposed to medical intervention, particularly in cases of clinical mental illness, were inclined to resort initially to religious consultation and the support of fellow congregants.
A final area of comparison was the relative ability of the families to maintain sibling contact between Joshua and Jessica. The V.'s have done well in this area. Aldo is Jessica's godfather and he and Lisa have maintained a close bond with her. Aldo and Lisa speak to Jessica on the phone weekly and send her pictures of Joshua. They traveled to Minnesota to visit Frank P. and Jessica this spring. In comparison, Chad P. attempted to meet Frank P. on June 18, but Frank P. would not talk to him. When Chad and Sara visited Minnesota this May to see their own family, they repeatedly attempted to contact Frank P. in an effort to visit Jessica. Frank P. rebuffed all their attempts. Frank P. told the evaluator that he is uneasy with the Truth Baptist Church community based on his conversations with Kelly S. prior to her death. Thus, although the P.'s have certainly tried to establish contact with Jessica's father, Frank P.'s apparent hostility to their religious views has negated their efforts. Conceivably, Frank P.'s response might be different if the P.'s had custody of Joshua.
These points slightly favor the V.'s. But there are other factors that tend to counterbalance them. First, both Chad and Sara P. knew Joshua during his first two months of life. Sara had watched him, held him, and changed him on numerous occasions. Although the V.'s knew the other three S. children, and knew Jessica especially well, the V.'s had never met Joshua prior to June 10. The P.'s were experienced parents with two children in their house, while the V.'s were newlyweds. Ironically, Chad and Sara both come from Minnesota and return there at least once a year. This connection might facilitate contact between Joshua and Jessica. Finally, while both couples unquestionably have high moral standards, the P.'s are people of deep religious faith and presumably of the same religion as Joshua.[14]
While some differences did exist between the families at the time of the evaluation and undoubtedly before, this court is reluctant to assign each family a grade point average and denominate a valedictorian. The more salient point is that this court finds that, in the early summer of 1999, it would not have been detrimental to Joshua to place him with Chad and Sara P. Stated differently, DCF at that time would not have been able to overcome the presumption in favor of the testamentary guardians and had no basis to override the S.'s will. Bristol v. Brundage, supra,24 Conn. App. 406. CT Page 10351
The upshot of this discussion is that DCF should have placed Joshua with the P.'s originally or transferred him to them shortly after their actual placement of him with the V. family. In the latter case, a transfer would have occurred before significant bonds could have developed. Joshua could have been transferred from the V. home to the P. home in a gradual way, with the assistance of outside counselors, so that there would have been a minimum of trauma to him. It is noteworthy that DCF was not reluctant to place Jessica in a temporary foster home prior to a more permanent transfer. It could have done the same with Joshua.
DCF did not handle the case this way. Accordingly, the court must address the current situation.
4. The Current Situation
From the very beginning, Aldo and Lisa V. gave the surviving S. children all the time hey could humanly afford. Among other sacrifices Aldo and Lisa made was their honeymoon, which they had to postpone. From the morning of June 10, 1999, Aldo spent virtually seven straight days at the hospital. He performed the painful task of informing his goddaughter Jessica about the deaths of both her parents and two of her siblings. Lisa spent long days at the hospital as well.
Joshua has thrived in the V. home. He is now over sixteen months old and developing normally. When both Aldo and Lisa are at work or school, Joshua receives excellent day care from Aldo's aunt. Joshua is closely bonded to Aldo and Lisa. He calls them "Dada" and "Momma" and looks to them for comfort and stimulation. Aldo and Lisa love Joshua as if he were their biological son. They strongly desire to adopt him. As the proposed custodians and adoptive parents of Joshua, Aldo and Lisa V. are certainly "suitable and worthy of such responsibility. . . ." General Statutes § 46b-129(j).
To remove any toddler from the home where he has profitably spent most of his life might prove detrimental to him. But this point is especially true in Joshua's case because he is particularly susceptible to emotional problems. To begin with, Joshua may have inherited his mother's genetic predisposition to depression. In addition, Joshua has already experienced much trauma. Joshua was a nursing infant and thus developed some bond with his natural mother in his first two months, which bond was disrupted when she killed herself and most of her family. Joshua then lived in hospitals for approximately twelve days. Given the additional fact that Joshua has developed a close bond with Aldo and Lisa, taking Joshua out of this home would, according to the credible opinion of Dr. Phillips, create a significant risk of Joshua developing a reactive attachment disorder or other psychological difficulty. CT Page 10352
As Joshua grows up, he will have to told that both his biological parents and two of his biological siblings are dead. He will have to be told about the horrible way that they died. This experience will undoubtedly be traumatic for Joshua. He has had enough trauma in his life and is already at risk for more. To tear Joshua away from the loving household where he has resided for the last fourteen months would only compound the tragedy and difficulty in his young life. The court finds that it would be detrimental at this time to place Joshua in the home of the testamentary guardians. He should remain permanently with Aldo and Lisa V. and become their adopted son.
Chad and Sara P. have continued to visit Joshua and have demonstrated, through their involvement in this case, their deep interest in his well-being. They are an important part of his life story. They get along well with Aldo and Lisa. They are mature, responsible parents. The court urges the V.'s to permit continued visitation of Joshua by the P.'s. In general, this court is not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for a child's growth and development." Michaud v. Wawruck, 209 Conn. 407, 415, 551 A.2d 738
(1988).
THE APPLICATION FOR APPOINTMENT AS STATUTORY PARENT
Given the discussion above, DCF should be appointed statutory parent for the purpose of facilitating the adoption of Joshua by the V.'s. The remaining issue is whether this court has authority to make that appointment.
A "statutory parent" is an entity that may, "subject to the approval of the Court of Probate . . . give in adoption to any adult person any minor child of whom he is the statutory parent." General Statutes §45a-724(a)(1). The statutory parent is usually DCF or a child-placing agency. General Statutes § 45a-718(a). "A minor child shall be considered free for adoption and the Court of Probate may grant an application for the appointment of a statutory parent if [among other things] . . . the child has no living parents." General Statutes §45a-725(a). "If a child is free for adoption . . . and no appointment of a statutory parent has made . . . the Court of Probate shall appoint a statutory parent for the child upon petition for appointment of a statutory parent by the guardian of the person of the child or a duly authorized officer of any child care facility or child-placing agency." General Statutes § 45a-718(a).
As these statutes make clear, the legislature has authorized the "Court CT Page 10353 of Probate" to appoint a statutory parent in a case, such as the one here, in which a child has no living parents. The question is whether this authority is exclusive. The Appellate Court recently addressed a similar question in Sender v. Sender, 56 Conn. App. 492, 743 A.2d 1149
(2000). According to Sender, the analysis should start with the following proposition:
 The Superior Court of this state as a court of law is a court of general jurisdiction. It has jurisdiction of all matters expressly committed to it and of all others cognizable by any law court of which the exclusive jurisdiction is not given to some other court. The fact that no other court has exclusive jurisdiction in any matter is sufficient to give the Superior Court jurisdiction over that matter.
(Internal quotation marks omitted.) Id., 497. The Sender Court observed that there are three matters over which the probate court historically has had exclusive original jurisdiction: custody of a child not the issue of a marriage involving a divorce, settlement of an executor's or administrator's account, and the question of the due execution of a will. Id., 498. The present matter obviously does not fall into any of these categories.
When the legislature intends to confer exclusive jurisdiction on a court, it usually employs specific language to that effect. Id. See, e.g., General Statutes § 46b-212h(a) ("The Family Support Magistrate Division or the Superior Court issuing a support order consistent with the law of this state has continuing exclusive jurisdiction over a child support order . . . General Statutes § 52-12 ("The Superior Court shall have exclusive jurisdiction of all matters relating to the sale of real property in which the general assembly before June 1, 1886 exercised jurisdiction. . . ."). In this case, there is no specific language conferring exclusive jurisdiction on the probate court to grant statutory parent authority.[15]
Further, the legislature has specifically authorized the superior court to appoint a statutory parent at anytime after it has terminated parental rights. See General Statutes § 17a-112(f). It appears from this authority that the legislature has conferred power on the superior court to appoint a statutory parent when the need to do so is ancillary to another matter over which the superior court clearly has jurisdiction. Although the legislature perhaps could not have anticipated the unique case at issue here, the same logic applies. Because the appointment of a statutory parent is ancillary to the neglect disposition case over which this court clearly has jurisdiction, this court has power to appoint a CT Page 10354 statutory parent. For the reasons stated, the court appoints DCF as the statutory parent of Joshua S.[16]
CONCLUSION
Based on the foregoing discussion, this court, for the disposition of the neglect petition, hereby vests the care and personal custody of Joshua S. with Aldo and Lisa V. The court also grants DCF's motion to be appointed statutory parent for the purpose of facilitating Joshua's adoption by the V.'s.
It is so ordered.
Carl J. Schuman Judge, Superior Court