MacDonald, D. Lloyd, J.
Before the Court is the motion of the plaintiff City of New Bedford/Ronald LaBelle, Commissioner of Public Infrastructure as the Appointing Authority (collectively, the “City”) for judgment on the pleadings. The case is here on the City’s appeal pursuant to G.L.c. 31, §44 of the decision of the defendant Civil Service Commission (the “Commission”) modifying a June 2002 personnel action taken by the City with respect to its employee, the defendant Alvin Ramos (“Ramos”). The City’s motion is ALLOWED for the reasons that follow.
Facts Found by the Commission
Ramos, a tenured Civil Service employee, had worked for the City for 19 years prior to May 28, 2002 when the incident underlying the case occurred. Ramos was a skilled laborer in the City’s Water Department.
On the day of the incident Ramos and three crew members working under him were assigned to a lead pipe replacement project by Ramos’s supervisor at the Water Department. The work on the project was supposed to have begun on site at approximately 8:30 a.m. However, when Ramos’s supervisor arrived at 11:15 to check on progress, no work had yet been done by Ramos and the crew. Instead, Ramos and the crew were sitting in their vehicles with the engines running or standing outside.
According to the Commission’s findings, when challenged by the supervisor as to why the job had not been started, “none of the crew answered [the supervisor’s] inquiry and Ramos did not answer him but turned and walked away and began to set up the traffic cones and wooden horse barricades ... to begin working the job.”
The supervisor thereafter “in anger" ordered Ramos and the crew off the job site.
Disciplinaiy proceedings against Ramos were initiated. On June 11, 2002 a hearing was held before the appointing authority, and on June 12th Ramos was notified that he was terminated, effective that date. The reason for the termination was given as Ramos’s failure to perform his work duties on May 28, 2002 and his past work record and disciplinary history.
As to Ramos’s work record and disciplinary history, in its decision, the Commission found the following, inter alia:
In October 1983 (the year of Ramos’s initial hire) he was disciplined for sick leave abuse and received a 90-day probation.
In June 1984 he was disciplined again for sick leave abuse and given a 60-day suspension.
In September 1984 Ramos was terminated by the Cify for sick leave abuse. However, he appealed to the Commission, which ordered him reinstated in March 1985. The Commission modified the sanction to a 6-month suspension.
In January 1986 Ramos received a verbal warning for two incidents of drinking alcohol during working hours.
In February 1992 Ramos was cited for threatening another employee with bodily injury.
In November 1992 Ramos was warned again for sick leave abuse and given a 90-day suspension.
In February 1993 Ramos was cited once more for sick leave abuse and required to present medical certification for any future sick leave requests.
Notwithstanding the February 1993 personnel action, in July 1996 Ramos received a further 60-day suspension for additional sick leave abuse.
In September 1998, another 90-day probation for sick leave infractions was imposed on Ramos.
In June 1999 Ramos was suspended for five days on account of having dug a hole on private property using City equipment.
On October 1, 2001, Ramos received a written warning for his “chronic history of absenteeism.” In lieu of a 30-day suspension, Ramos agreed to a 20-day suspension, and he signed an undertaking with the City (referenced by the Commission as a “Last Chance Agreement”). In the agreement Ramos wrote: “I understand this is my final warning. Any further discipline will result in my dismissal. I sign of my own free will, no pressure or coercion of any kind has been used against me.” *526 Eight months later the incident that is the subject of this appeal occurred.
At the hearing before the Commission on Ramos’s appeal of his termination, Ramos and his crew testified that the reason they had not started work on the job on the day of the incident was that they were waiting for their supervisor to arrive. As the appointing authority had at the original hearing, the Commission rejected Ramos’s story. In its decision, the Commission found that “[t]he testimony of Ramos [and his crew] has no credibility. Their testimony was improbable in parts and implausible in parts yet thoroughly prepared and coordinated.”
On the other hand, the Commission found the testimony by Ramos’s supervisor to the contrary to have been credible in all respects (“[h]is answers were unhestitating, honest, straight forward, consistent and plausible”). The Commission further noted in its findings: “Water Commissioner Ronald Labelle (sic) described Ramos as a good worker but a bad employee!,] and this is an accurate description, considering Ramos’s past work history and discipline history.”
The Commission concluded: “[Ramos’s] behavior or inactivity . . . during the morning of May 28, 2002 is serious, substantial and unexcused. This act of misconduct is especially serious as it relates to [Ramos], as he was then employed under a ‘Last Chance Agreement’ by which he could be terminated from employment if he were to justly receive any further discipline. He has committed an act or omission justly deserving of serious discipline in this present case. The [City] had just cause under the circumstances of this charge, occurring on May 28, 2002, to severely discipline [Ramos].”
Notwithstanding these findings and conclusions, the Commission voted (3-2) to vacate Ramos’s termination and to modify the City’s sanction by substituting a suspension without pay or benefits for the termination. The suspension was for “time served (from June 12, 2002 to a reasonable date after receipt of this decision [dated November 10, 2004]).” The Commission took this action, noting its “considerable discretion under [G.L.c. 31, §43], to modify a penalty after hearing.”[1]
The Court’s Scope of Review
By the statute’s terms, the Court’s review pursuant to G.L.c. 31, §44 is according to the conventional standard of judicial review of administrative decisions pursuant to G.L.c. 30A, §14. As such, the Court is required to give “due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.” Id., §14(7). See Thomas v. Civil Service Commission, 48 Mass.App. 446, 451 (2000); Tri-County Youth Programs, Inc. v. Acting Deputy Dir. of the Div. of Employment and Training, 54 Mass.App.Ct. 405,408 (2002). The agency’s decision, however, must be supported by substantial evidence. G.L.c. 30A, §14(7).
“Substantial evidence” means such evidence as a reasonable mind might accept as adequate to support a conclusion. Id., § 1 (6). When applying the substantial evidence standard, the Court considers the record as a whole. The Black Rose, Inc. v. City of Boston, 433 Mass. 501, 503 (2001). “[T]he substantial evidence test accords an appropriate degree of judicial deference to administrative decisions, ensuring that an agency’s judgment on questions of fact will enjoy the benefit of the doubt in close cases, but requiring reversal by a reviewing court if the cumulative weight of the evidence tends substantially toward opposite inferences.” Cobble v. Comm’r of the Dept. of Social Services, 430 Mass. 385, 391 (1999).
In substance, the Court is required to give the Commission, as an agency of the Commonwealth, wide discretion within the subject matter of its statutory jurisdiction. However, the Commission in exercising its own review function pursuant to G.L.c. 31, §43 is itself not free to substitute its judgment as to matters that relate to merit and policy considerations within the bounds of the reviewed agency’s lawful discretionary authority. Town of Falmouth v. Civil Service Commission, 61 Mass.App.Ct. 796, 800 (2004).
“The issue for the commission is ‘not whether it would have acted as the appointing authority had acted, but whether, on the facts found by the commission, there was reasonable justification for the action taken by the appointing authority in the circumstances found by the commission to have existed when the appointing authority made its decision.’ ” Id. (quoting Watertown v. Arria, 16 Mass.App.Ct. 331, 334 (1983).
Returning to the scope of the Court’s review of the Commission’s action, the SJC has stated that the “rationale for judicial deference ceases to apply where [the court] concluded] that the agency has failed to adhere to its own statutory mandate and regulatory framework by making a decision without evidentiary support. In such cases, [the court is] required by the State Administrative Procedure Act to correct the agency’s judgment by means of its own.” Cobble, supra at 395.
Basis of the Court’s Decision Granting Judgment to the City
On the facts found and recited by the Commission, it is stunning to the Court that the Commission would nullify the reasoned decision of the City to terminate Ramos and impose, instead, another in a string of ineffective suspensions that marked Ramos’s 19 years as a City of New Bedford employee.
The Commission cited Police Commissioner of Boston v. Civil Service Commission, 39 Mass.App.Ct. 594 (1996), for the proposition that it has “considerable discretion” to modify an appointing authority’s pen *527 alty. However, in that case, where the Commission had reinstated a police officer whom the Police Commissioner had terminated because he had been found drunk in public, verbally abusive of his fellow police officers and without an explanation for the loss of his revolver, the Appeals Court reversed the Commission’s action.
In doing so, the Appeals Court noted, id. at 600, that the Commission’s “power to modify” is “ ‘not without bounds’ and the (C)ommission may not modify a penalty without providing a reasoned explanation for doing so” (citing Faria v. Third Bristol Div. of the Dist. Ct. Dept., 14 Mass.App.Ct. 985, 986 (1982)).
“(The Commission’s power to modify] must be used to further, and not to frustrate, the purpose of civil service legislation, i.e., ‘to protect efficient public employees from partisan political control.’ [The power to modify] ‘is not to be used ‘to prevent the removal of those who have proved to be incompetent or unworthy to continue in the public service.’ ” Id. (citations omitted).
These principles have been reinforced by subsequent decisions of the Appeals Court. For example, in Cambridge v. Civil Service Commission, 43 Mass.App.Ct. 300 (1997) (Kass, J.), in a case involving the Commission’s review of administrative action pursuant to G.L.c. 31, §2(b), the Court noted that the Commission’s determination as to whether the administrator’s action was “ ‘(¡Justified,’ in the context of [the Commission’s] review, means ‘done upon adequate reasons sufficiently supported by credible evidence, when weighed by an unprejudiced mind, guided by common sense and by correct rules of law.’ ” Id. at 304. The Court elaborated:
When there are, in connection with personnel decisions, overtones of political control or objectives unrelated to merit standards or neutrally applied public policy, then the occasion is appropriate for intervention by the [C]ommission. It is not within the authority of the [C]ommission, however, to substitute its judgment about a valid exercise of discretion based on merit or policy considerations by an appointing authority.
Id. Accord Police Department of Boston v. Collins, 48 Mass.App.Ct. 408, 411-13 (2000) (review of personnel action pursuant to G.L.c. 31, §43).
Considering the current matter in light of the above principles, the Court must vacate the Commission’s order.
First, there is no suggestion in the factual record that the City’s action had “overtures of political control or objectives unrelated to merit.”
Second, the Commission itself affirmed the City’s determination that the City had “just cause” to terminate Ramos.
Third, the Commission in its own decision, characterized Ramos’s conduct as “serious, substantial and unexcused.”
Fourth, without hyperbole, it is difficult to imagine a scenario (other than one involving threats to personal safely) more deserving of decisive administrative action to terminate a public employee than that presented here. By the Court’s count, Ramos had been suspended or placed on probation because of chronic absenteeism, abuse of sick leave, drinking on the job and abuse of his fellow workers 9 times. Most significantly, at the time of Ramos’s “serious, substantial and unexcused conduct,” Ramos was subject to a “Last Chance Agreement.” The agreement was signed by Ramos, and in it he stated: “I understand this is my final warning. Any further discipline will result in my dismissal.”
Fifth, the manner in which Ramos responded to his supervisor’s discovery of his and his crew being found (literally) sitting down on the job was dismissive and insubordinate. Ramos turned his back on the supervisor and proceeded to make a pretense of work without offering an explanation for his and his crew’s behavior. Such conduct strikes at the heart of a public agency’s capacity to manage efficiently its workforce.
Finally, the Commission in its own decision concluded that “[t]he testimony of Ramos [and his crew] has no credibility. Their testimony was improbable in parts and implausible in parts yet thoroughly prepared and coordinated.” Implicit in such a conclusion by the Commission is that Ramos had deliberately and in concert with others misled the Commission in its fact-finding role. Ramos’s behavior before the Commission was of a piece with his 19-year record as a City of New Bedford employee and obstructed the Commission’s adjudicative function.
At a time when the word, “hack,” has been recklessly used to disparage public employees in the Commonwealth, it is particularly inappropriate that the Commission chose to nullify the principled action of the City of New Bedford to terminate its employee who exhibited, in brazen form, just the kind of abuse of the public trust that lies behind the hack stereotype.
The City’s decision to terminate Ramos was “done upon adequate reasons sufficiently supported by credible evidence, when weighed by an unprejudiced mind, guided by common sense and by correct rules of law.” Cambridge v. Civil Service Commission, supra at 304. Accordingly, there was no occasion for the Commission to substitute its judgment for that of the City as to a suitable penalty.
The decision of the Commission to modify such action was in excess of its statutory authority, was based on an error of law, was unsupported by substantial evidence, was unwarranted by the facts which the Commission itself found and was arbitrary, capri *528 cious and an abuse of discretion. G.L.c. 30A, §14(7) (b), (c), (e), (f) and (g).
ORDER.
Judgment shall enter on the pleadings for the plaintiff City of New Bedford/Ronald LaBelle, Commissioner of Public Infrastructure as the Appointing Authority.

 The Commission particularized its reasons for relieving Ramos of the sanction of termination by noting that Ramos “was a ‘good worker’ and a versatile worker for the City, having performed in every job title position over his career . . . [I]t is noted that the ‘last chance agreement’ that [Ramos] was employed under at the time of the disciplinary incident in this present case, remains in full force and effect. He will not receive any further consideration from the Commission in the event of any future disciplinary action against him.”