370                64 Mass. App. Ct. 370 (2005)

Allen of Michigan, Inc. *v.* Deputy Director of the Division of Employment & Training.

## ALLEN OF MICHIGAN, INC. *vs.* DEPUTY DIRECTOR OF THE DIVISION OF EMPLOYMENT & TRAINING & another.[1]

No. 03-P-1511.

Suffolk. October 13, 2004. - August 30, 2005.

Present: GELINAS, SMITH, & GREEN, JJ.

*Division of Employment and Training. Employment Security,* Discharge. *Employment,* Termination. *Administrative Law,* Substantial evidence.

In an action brought by a hospice pursuant to G. L. c. 151A, § 42, for review of an award of unemployment benefits to its former case manager, the judge erred in affirming the award, in that the case manager was disqualified from receiving such benefits under G. L. c. 151A, § 25(*e*)(2), because her failure to visit a certain patient when she served as the on-call nurse, and her insubordination to the triage nurse's determination that a visit to that patient was necessary, constituted a knowing violation of a reasonable and uniformly enforced rule or policy of the hospice, and the patient's family did not exercise their rights under the Hospice Patient's Bill of Rights to refuse such a visit. [376-382]

CIVIL ACTION commenced in the Boston Municipal Court Department on July 10, 2003.

The case was heard by *Dermot Meagher*, J., on a motion for judgment on the record.

*Romeo G. Camba*, Assistant Attorney General, for Deputy Director, Department of Employment & Training.

*Ilene Titus* for Nancy M. Serapiglia.

*Richard D. Wayne* for the plaintiff.

GELINAS, J. Pursuant to G. L. c. 151A, § 42, Allen of Michigan, Inc., doing business as Beacon Hospice (Beacon), seeks review of a judgment of the Boston Municipal Court affirming a decision of the board of review of the Division of Employment and Training, which awarded unemployment benefits to the claimant, Nancy M. Serapiglia. We reverse.

---

[1]Nancy M. Serapiglia.

*Facts.* We take the facts from the findings of the review examiner, and where appropriate, from evidence introduced at the hearing. Beacon provides around the clock, "compassionate" care to terminally ill patients and their families.[2] Beacon markets its employees as experts on pain and symptom management, and promises its clients that no patient will die in pain.

Beacon provides its after hours services through a three-tier, on-call system. Beacon's answering service takes all calls from the toll-free number and refers them to a triage nurse. The triage nurse, an experienced nurse, deals directly with the patient and the family and determines what course of action is needed. Pursuant to Beacon's written policy relating to on-call services, the triage nurse determines whether a home visit to the patient is necessary.[3] On June 24, 2002, Serapiglia, a registered nurse, began working full-time as a case manager for Beacon.

All new employees receive thorough orientation and training. As part of the orientation, nurses learn that the triage nurse is the acting nurse manager and is responsible for directing on-call nurses. Serapiglia signed an orientation checklist indicating that she had received orientation in this matter. Once Serapiglia's orientation ended, she was placed in the ongoing rotation for on-call duties.

As a case manager, Serapiglia's duties included assessing and managing the pain and symptoms of patients in nursing homes and in home care, making sure they were comfortable and pain free, and providing emotional support to the family. The "after hours" supervisor for the on-call nurse[4] is the on-duty triage nurse, in this case, Patty Calnan. Margaret Garvey was the administrative backup to the triage nurses.

In the early afternoon of Sunday, January 26, 2003, the client, a family of four from Canton, called the toll-free number

[2]Beacon provides nursing, social work, spiritual, home health aide, and bereavement services before the patient's death, and for the family, after death.

[3]According to Margaret Garvey, Beacon's vice-president of clinical operations, there were two reasons for this policy: Beacon wants (1) the most knowledgeable and experienced individual making the decisions, and (2) consistency in the decision-making.

[4]In the administrative record, the visiting nurse is also referred to as the field nurse and on-call nurse.

seeking services. The daughter of the patient asked Calnan, the triage nurse, for a nurse to come out to the Canton home to provide services for her father, who was terminally ill. Calnan decided that a home visit to Canton was necessary.

Calnan called Serapiglia, the on-call nurse. Serapiglia lived in Bristol, Rhode Island, which by her own estimate is one and one-half hours away from Canton. The review examiner found as fact that Calnan told Serapiglia that a visit was necessary at this time.[5] According to Calnan, Serapiglia was "very resistant to go out."

Rather than make the visit, Serapiglia called the family. According to Serapiglia, after they went over a number of issues, the family was completely satisfied, and the family told Serapiglia that they did not think a home visit was "necessary." Serapiglia told them to feel free to call the triage nurse back if they changed their mind about the need for a visit.[6] Serapiglia did not call Calnan back as instructed.

Shortly after 10:00 P.M., the patient's son again called Calnan. The review examiner found that the son informed Calnan that the patient was having increased difficulty breathing and was "unresponsive," and that the son stated that he was very angry at Beacon as no nurse had come to visit the family.

Calnan apologized, informing the son that she would try to get a nurse out there immediately. Calnan immediately called Serapiglia, expressing disbelief that she had not gone out to make the visit, and instructed Serapiglia to go out to the home

---

[5] When first questioned about this conversation, Serapiglia admitted that Calnan had informed her that "she thought that they needed a visit." At the end of the first day of hearing, Serapiglia contradicted herself, denying that Calnan had directed her to visit the patient at that time. Serapiglia claimed that Calnan only directed her to *call* the family about the patient's "lethargy" problem. On cross-examination at the second day of hearing, however, Serapiglia admitted that Calnan told her to visit the patient.

[6] Serapiglia subsequently called the patient's regular nurse, Kim Walsh, in order to get some background information on the patient and to inform Walsh of what had happened and what she had told the family. According to Serapiglia, several nurses at Beacon had a courtesy agreement between themselves to switch on-call assignments based upon the location of the patient's home and the nurse's home. Walsh informed Serapiglia that she had earlier given the family the same instructions and placed all the necessary information about medications on their refrigerator.

immediately. Serapiglia kept repeating that she was "not blow-ing them off." She told Calnan that she had made several calls to the family, and that in her opinion, the family did not need a visit.[7] Calnan repeatedly told Serapiglia that she had to go, not-ing "much resistance" to this instruction. When Serapiglia indicated that she would call them in an hour, Calnan said, "you have to go right now."

According to Calnan, Serapiglia then allegedly agreed to go to the home. However, she did not do so; rather, at around 11:00 P.M., Serapiglia called the family.[8] During this call, the son indicated that his father was breathing faster. Serapiglia gave the son instructions on how to administer liquid morphine.[9]

Serapiglia called back at 11:10 P.M. According to Serapiglia, the son informed her that his father was breathing a lot better, his respiration was down, and he looked much better and ap-peared to be sleeping, adding that the family was very thankful and relieved that the "whole episode had come and went within a short period of time" and was under control. Serapiglia instructed the son to give the father pain medication every hour. Serapiglia testified that, when asked whether the family wanted her to come out, the son said, "no, . . . he felt much better and they were fine." The review examiner credited this testimony.

Serapiglia also testified that she conferred with Debbie Allen, a more senior Beacon nurse and a friend, and was advised that regardless of what the triage nurse said, if the family said not to visit, the on-call nurse could not go to the home. The review examiner found that Serapiglia believed that she could not visit the patient's home if the family told her they did not want her

---

[7]At the first day of hearing, Serapiglia testified that of the seven telephone calls she made to the family that day, the second one occurred at 11:01 P.M. and was made in response to the call she received from Calnan at about that time. Serapiglia admitted that she was told by Calnan that the father was hav-ing increased difficulties breathing, but denied that Calnan told her during this call that she needed to visit the family. The review examiner did not make a credibility determination on this dispute of fact.

[8]While Serapiglia was on the telephone with the son, Calnan called the family to make sure Serapiglia was on her way. The son answered, stating that Serapiglia was on the other line and asked Calnan to call back in ten minutes.

[9]Serapiglia testified that when she informed the son that she would leave immediately to drive there, he said it was not necessary for her to come out at that time since it was snowing and it looked "really bad out."

there, and that based upon a section of Beacon's patient Bill of Rights that stated that a patient or family could refuse to permit a nurse to visit, her belief was reasonable.

Calnan testified that when she called the son back, the son told her that Serapiglia had informed him that she was not going to visit, and that the family had called the fire department (911) for help. Calnan then called Serapiglia again, stating that the family was "hysterical" and out of control and needed a visit. When Serapiglia indicated that she did not think that the family needed a visit at that time, Calnan ordered her to visit them. Calnan noted that Serapiglia refused her order, explaining that the drive was too long and the weather was not good. Serepiglia did not raise the family's alleged refusal of her visit.

Rather than visiting the family, Serapiglia again placed a call to them. According to Serapiglia, the family was not hysterical and the only reason the son called 911 was to get his father's blood pressure taken. Serapiglia called the family back several times between 11:00 P.M. and 12:00 A.M. to check their status. According to Serapiglia, they were very calm.

Calnan called Garvey, the administrative backup for triage nurses, for advice around midnight, explaining that despite her original and follow-up instructions, Serapiglia had not yet made the home visit as directed, even though the father's condition had declined seriously.

At 12:30 A.M., Garvey called Serapiglia, accusing her of leaving the patient in pain all day. She ordered Serapiglia to visit the patient, and to call Garvey back when she had finished. Garvey indicated that the patient, who had been in distress all day, needed a home visit and that they would discuss the situation the following day. Serapiglia replied that she had not refused to make the visit and that she simply did not think that the family needed one. Garvey stated that the issue was not open for discussion since the decision had been made, adding that the patient was actively dying and there was no doubt that a visit must be made. Serapiglia admitted that she did not tell Garvey that the family did not think it was necessary for her to visit.

At 1:19 A.M., the son called Calnan to tell her that his father had died. Calnan heard the family crying in the background.

The son indicated that Serapiglia had never come. Calnan felt terrible and offered to continue to support the family in any way Beacon could. When she indicated that Serapiglia would be out to pronounce the father dead, the son hung up on her. According to Garvey, the family is still very angry with Beacon.

Calnan reached Serapiglia, who was en route to the family home, on her cellular telephone. Serapiglia subsequently arrived at the family's home and pronounced the patient dead.

On Monday morning, January 27, 2003, Garvey informed Serapiglia that she was terminated immediately. Garvey explained that home visit decisions are made by triage nurses and that by deciding not to visit the family, Serapiglia had violated a policy known by "every nurse." Serapiglia testified that Garvey gave two reasons for the discharge: (1) leaving a patient in pain for over twelve hours, and (2) insubordination. Serapiglia did not contest the facts and left Beacon's office without incident.

Serapiglia's application for benefits was initially denied based on a determination that she had engaged in disqualifying conduct by deliberately refusing to visit an actively dying patient as directed by her employer's supervising triage nurse. Serapiglia filed a timely appeal, and after a hearing, a review examiner awarded her benefits. The board of review denied Beacon's application for review, rendering the review examiner's decision final. A judge of the Boston Municipal Court affirmed the decision and Beacon appeals.

*The hearing.* With no objection, the first day of hearing before the review examiner was held by telephone. Serapiglia was not represented by counsel. During the course of the telephone hearing, Garvey offered to provide the review examiner with Beacon's written on-call policy. The review examiner responded that, as it was impossible to get the written policy to Serapiglia during the hearing, Garvey should "just tell me what it is." Garvey went on to explain the policy, stating that the policy "describes how our 24-hour services are available along with the system we have in place, which is the answering service and then the triage," and that the policy "also states that the determination for a visit is made by the triage nurse." There is

nothing in the record indicating that the written policy was ever entered in evidence.

Based apparently on Garvey's testimony in response to the review examiner's request that the written policy be explained to her, as well as Calnan's testimony, the review examiner found that "[t]he employer expects on-call nurses to visit a patient when the triage nurse determines that a visit is necessary. The employer maintains the expectation because the triage nurse is more experienced tha[n] the on-call nurse." The review examiner further found that "[t]he expectation is explained at orientation," but that "[n]evertheless, [Serapiglia] failed to visit the patient's home when instructed to do so by the triage nurse." The review examiner ultimately found, however, that "the employer failed to establish the existence of a relevant rule or policy. Therefore, it cannot be concluded that [Serapiglia's] discharge is attributable to a knowing violation of a reasonable rule or policy of the employer. The question then becomes whether [Serapiglia's] discharge is attributable to deliberate misconduct in wilful disregard of the employer's interest."

Further, although Serapiglia admitted that she completed the orientation program, she testified that she was not told about the managerial role of the triage nurse at the orientation and that she was unaware of the existence of a triage nurse until she started working. In her experience, Serapiglia claimed, the triage nurses never instructed her on what to do — they simply provided the assignments and she took care of them as she saw fit. Serapiglia further testified that she understood that pursuant to Beacon's policies, the *on-call* nurse made the decision about whether to make a home visit; and that during the night in question, she confirmed this fact with her coworkers. She did not recall hearing otherwise at the orientation. The review examiner necessarily discredited the crux of this testimony, finding that the employer expects on-call nurses to visit a patient when the triage nurse — a more experienced nurse — determines that a visit is necessary; that the expectation was reasonable; and that this expectation was explained to Serapiglia at her orientation.

*Discussion.* Our review is governed by the standards set out in G. L. c. 30A, § 14(7). We give "due weight to the experi-

ence, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it," *Athol Daily News* v. *Board of Review of the Div. of Employment & Training*, 439 Mass. 171, 174 (2003), quoting from G. L. c. 30A, § 14(7), and look to the record to determine whether the review examiner applied correct legal principles in reaching her decision. *Guarino* v. *Director of the Div. of Employment Sec.*, 393 Mass. 89, 92 (1984). We must determine whether the decision "contain[s] sufficient subsidiary findings to demonstrate that correct legal principles were applied" and whether those findings are supported by substantial evidence. *Lycurgus* v. *Director of the Div. of Employment Sec.*, 391 Mass. 623, 626-627 (1984). *Tri-County Youth Programs, Inc.* v. *Acting Deputy Director of the Div. of Employment & Training*, 54 Mass. App. Ct. 405, 408 (2002). If the agency's finding "is supported by 'such evidence as a reasonable mind might accept as adequate to support a conclusion,' " we do not disturb the decision. *Raytheon Co.* v. *Director of the Div. of Employment Sec.*, 364 Mass. 593, 595 (1974), quoting from G. L. c. 30A, § 1(6). See *Tri-County Youth Programs, Inc.* v. *Acting Director of the Div. of Employment & Training*, 54 Mass. App. Ct. at 408. Further, we do not determine the facts anew or judge credibility. See *Fisch* v. *Board of Registration in Med.*, 437 Mass. 128, 138 (2002).

The fact, however, that the administrative record may contain some evidence from which a rational mind might draw an inference in support of the agency's decision does not end our inquiry. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981). Our task, rather, is to "examine the entirety of the administrative record and take into account whatever in the record fairly detracts from the supporting evidence's weight," in order to determine whether the agency's decision is supported by substantial evidence. *Cobble* v. *Commissioner of the Dept. of Social Servs.*, 430 Mass. 385, 390-391 (1999). If we determine that the cumulative weight of the evidence tends substantially toward an opposite inference, we reverse the agency's decision. See *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecommunications & Energy*, 440 Mass. 625, 632 (2004).

The initial hearing was conducted by telephone on or about March 28, 2003. Although permissible under DET rules, telephone hearings present certain difficulties. In light of a review examiner's obligation to make credibility findings, the inability of the review examiner to see the witnesses and observe their demeanor removes an important element of the credibility calculous.

Additionally, there is difficulty with the introduction of exhibits. Here, Garvey was asked about Beacon's written on-call policies. The review examiner indicated that she did not have a copy of the written policies. Garvey offered to provide her with one. In response, the review examiner stated, "Well, you cannot get it to Ms. Serapiglia right now during the [telephone] hearing, that is why I would ask that you just tell me what it is." Garvey proceeded to testify about the policy, including its provision that the triage nurse (and not the on-call nurse) makes the determination as to the need for a home visit. The review examiner, however, ultimately concluded that "[t]he employer failed to establish the existence of a relevant rule or policy." While a telephone hearing per se may not work to vitiate the proceedings, we enter a strong cautionary note against its use.

A second day of the hearing was held on April 29, 2003. Serapiglia, unrepresented during the telephone hearing, had retained an attorney. Although Serapiglia had completed her testimony on the first day, the review examiner gave the attorney permission to conduct extensive redirect examination. Serapiglia added significantly to her original testimony, raising for the first time the critical issue of the provision in the patient's Bill of Rights, that a patient may refuse services, as the mitigating factor that allegedly excused her behavior. Beacon's attorney did not object to the lengthy redirect or to the introduction of the Bill of Rights into evidence.

An employer may demonstrate that a claimant is subject to disqualification under G. L. c. 151A, § 25(e)(2), in one of two ways: by showing that the claimant's acts and omissions amounted to (1) "deliberate misconduct in wilful disregard of the employing unit's interest" or (2) "a knowing violation of a reasonable and uniformly enforced rule or policy of the

employer." The second prong was added in 1992 and was intended to broaden the grounds for disqualification. See *Still* v. *Commissioner of the Dept. of Employment & Training*, 423 Mass. 805, 811 (1996). The review examiner correctly identified this as a § 25(*e*)(2) case and properly placed the burden of proof on the employer. See *id*. at 809.

The review examiner first found that Beacon failed to establish the existence of a relevant rule or policy, and that therefore, Serapiglia's discharge could not be attributable to a knowing violation of Beacon's reasonable rule or policy. This finding is inconsistent with the review examiner's finding that Beacon reasonably expected its on-call nurses to visit a patient when the triage nurse determined that a visit was necessary, and that the "expectation" was explained to Serapiglia at orientation, and therefore was known to her. While the review examiner characterized the requirement as an "expectation," the cumulative weight of the evidence clearly established a rule or policy. *Cobble* v. *Commissioner of the Dept. of Social Servs.*, 430 Mass. at 390, 391.

The finding that the "expectation," which we conclude was in reality a policy, was reasonable and known to Serapiglia compels a conclusion that Serapiglia's discharge was attributable to a "knowing violation of a reasonable and uniformly enforced policy." Indeed, the review examiner concluded that Serapiglia failed to visit the patient's home when instructed to do so by the triage nurse. Compare *Still* v. *Commissioner of the Dept. of Employment & Training*, 423 Mass. at 816; *Boston* v. *Deputy Director of the Div. of Employment & Training*, 59 Mass. App. Ct. 225, 228-230 (2003). The evidence further compels a conclusion that Serapiglia was consciously aware that the consequence of her disregard of Calnan's orders was a violation of Beacon's policies. See *Still* v. *Commissioner of the Dept. of Employment & Training*, 423 Mass. at 813. While the fact that Serapiglia was aware of the expectation or policy based upon the orientation would be insufficient to show a knowing violation, see *id*. at 814, the subsidiary findings, that she knew about the policy; that she sought advice from coworkers; that she failed to call Calnan or Garvey (or any other supervisors) to answer any questions she had about the policy

and any alleged conflict between it and the Bill of Rights; and her multiple refusals to follow orders over a twelve-hour period (in contrast to the single outburst at issue in *Still*) compel a conclusion that she had the requisite intent to commit a violation of the policy. Serapiglia's argument that the family's alleged exercise of the right to refuse services, pursuant to the Bill of Rights, acted to mitigate her multiple violations of the policy is not persuasive. Mitigating circumstances alone will not negate a showing of intent or thereby excuse a knowing violation. See *id.* at 815.

The critical issue in determining whether disqualification was warranted is her state of mind in performing the acts that caused her discharge. Factors to be considered while looking at her state of mind include: (1) "the worker's knowledge of the employer's expectation"; (2) "the reasonableness of that expectation"; and (3) "the presence of any mitigating factors." See *Still* v. *Commissioner of the Dept. of Employment & Training*, 423 Mass. at 810-811, quoting from *Garfield* v. *Director of the Div. of Employment Sec.*, 377 Mass. 94, 97 (1979). Here, several acts of misconduct over time, in disobeying several direct orders from Calnan to make a home visit and in failing to call back to report the outcome, as directed after Calnan's first call, compel a finding of the requisite intent. The evidence does not support the review examiner's conclusion that Serapiglia failed to visit the patient's home because the "family repeatedly told [her] that she did not need to come," and that this amounted, in Serapiglia's mind, to the family's invoking a right to refuse service under the Bill of Rights. The evidence also does not support the review examiner's further conclusion that "the family [decided] to exercise their rights under the Hospice Patient's Bill of Right[s] and refuse[d] a visit by [Serapiglia]." As to the former conclusion, the cumulative weight of the evidence in the record (i.e., that Serapiglia never reported to her superiors that the family was refusing services; that the family repeatedly called the triage nurse wondering where the on-call nurse was and requesting a visit; and that she discussed with the family the distance she would have to travel and the weather conditions) leads to the conclusion that any belief that Serapiglia might have had with respect to the family's refusing visits

under the Bill of Rights was unreasonable. As to the latter conclusion, that the family had in fact refused visits under the Bill of Rights, we further conclude that the cumulative weight of the evidence tends to the opposite inference, that the family in fact never refused visits under the Bill of Rights, but continued to ask for visits that Serapiglia found ways of refusing. Serapiglia's state of mind must be assessed as of the time of each act of misconduct. See *Jones* v. *Director of the Div. of Employment Sec.*, 392 Mass. 148, 150 (1984). Our review of the record shows that the cumulative weight of the evidence, from the time of the first request, when Serapiglia suggested that she might have another nurse who lived closer to the family's home make the visit, and her subsequent failure to make that visit, through her refusal to visit until so ordered by the supervisor, "fairly detracts from the supporting evidence's weight . . . [and] tends substantially toward opposite inferences." *Cobble* v. *Commissioner of the Dept. of Social Servs.*, 430 Mass. at 390-391. The review examiner's findings in this regard were not supported by substantial evidence.

In addition, the review examiner's finding that the family's decision to exercise their rights under the Bill of Rights and refuse a home visit was a circumstance mitigating Serapaglia's noncompliance with Beacon's policy conflicts with the finding that Beacon "failed to establish the existence of a relevant rule or policy." The finding also does not address the issue whether the discharge was attributable to deliberate misconduct in wilful disregard of Beacon's interest. To the extent that this finding can be seen as evidence that Serapiglia's actions were not in "wilful disregard of Beacon's interest," we again conclude, based on the cumulative weight of the evidence, that the family did not "exercise their rights under the Hospice Patient's Bill of Rights and refuse a visit."

The cumulative evidence in the record demonstrates a pattern of clear insubordination by Serapiglia. The review examiner's decision ignores the mission of the employer and the role of hospice nurses. Serapiglia's claim that the family did not want to be disturbed by a visiting nurse is refuted by clear evidence that they repeatedly called Calnan, that Calnan repeatedly called Serapiglia, and that the family was angry that a visit had not been made, even resorting to a call to 911 for help.

The judgment is reversed and a new judgment shall enter remanding the case to the Division of Employment and Training for entry of an order denying Serapiglia unemployment benefits.

*So ordered.*