Connolly, Thomas E., J.
INTRODUCTION
This case came on for hearing on the plaintiff, Perini/Kiewit/Cashman’s (“PKC”) Motion for Judgment on the Pleadings. PKC seeks judicial review under G.L.c. 15IB, §6 and G.L.c. 30A, §14(7) to set aside portions of the final order of the Massachusetts Commission Against Discrimination (“MCAD”) affirming its Hearing Officer’s decision. The Hearing Officer concluded that: 1) Mary Flaherty, a former PKC union laborer, was the victim of gender-based harassment by her supervisor Peter Buckjune in violation of G.L.c. 15IB; 2) Flaherty was awarded $15,000 in damages for the emotional distress she endured as a result of the harassment; 3) that PKC must conduct five (5) years of training with corresponding reporting requirements. PKC is a joint venture made up of three worldwide major construction corporations.[1]

STANDARD OF REVIEW

The review of this matter is governed by G.L.c. 30A, §14(7). The court “may set aside the decision of an administrative agency if it is not supported by substantial evidence.” Cobble v. Comm’r. of the Dept. of Soc. Serv., 430 Mass. 385, 390 (1999). “Substantial evidence” is “such evidence as a reasonable mind might accept as adequate to support a conclusion.” G.L.c. 30A, §1(6). The Appeals Court in Allen of Michigan, Inc. v. Deputy Director of the Division of Employment & Training, 64 Mass.App.Ct. 370, 377 (2005), further defines the substantial evidence as follows:
The fact, however, that the administrative record may contain some evidence from which a rational mind might draw an inference in support of the agency’s decision does not end our inquriy. See New Boston Garden Corp. v. Assessors of Boston, 383 Mass. 456, 466 (1981). Our task rather, is to “examine the entirety of the administrative record and take into account whatever in the record fairly detracts from the supporting evidence’s weight,” in order to determine whether the agency’s decision is supported by substantial evidence. Cobble v. Commissioner of the Dept. of Social Servs., 430 Mass. 385, 390-91 (1999). If we determine that the cumulative weight of the evidence tends substantially toward an opposite inference, we reverse the agency’s decision. See Fitchburg Gas & Elec. Light Co. v. Department of Telecommunications & Energy, 440 Mass. 625, 632 (2004).
Moreover, as stated by the Supreme Judicial Court in Cobble, supra, at 390-91:
The substantial evidence standard is thus fairly characterized as a test of rational probability: an agency’s conclusion will fail judicial scrutiny “if the evidence points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary” . . . Thus conceived, the substantial evidence test accords an appropriate degree of judicial deference to administrative decisions, ensuring that an agency’s judgment on questions of fact will enjoy the benefit of the doubt in close cases, but requiring reversal by a reviewing court if the cumulative weight of the evidence tends substantially toward opposite inferences.

FACTS

On August 27, 1998, Co-Defendant Mary Flaherty (“Flaherty”) filed a charge of gender-based harassment against the Plaintiff, Perini/Kiewit/Cashman (“PKC”), alleging that she was discriminated against on the basis of her sex in violation of G.L.c. 151B. Flaherty alleged that her supervisor, Peter Buckjune (“Buckjune”), “subjected her to harassment which included constant yelling and screaming at her, treated her more harshly than male employees, and terminated her employment without cause, replacing her with a male employee.” (Decision of the Hearing Officer, p. 1.) The Hearing Officer decided, and the Commission affirmed, that while Flaherty was not wrongfully terminated, she was subject to gender-based discrimination by Buckjune.
PKC was the general contractor for Contract Cl 1A1 (“Cl 1A1”), a section of the construction of the Central Artery (1-93) tunnels, new interstate highway interchanges, and ramps in downtown Boston, commonly known as the “Big Dig.” (T-266; Finding #1.) PKC, along with the other contractors working on the Big Dig, operated under a collective operating agreement known as the Project Labor Agreement, which required the contractors to employ a workforce of local trade unions, and to comply with the provisions of the local collective bargaining agreements for the various construction trades. (T-18, 19; Finding #2.). The Project Labor Agreement for the Big Dig contained a grievance and arbitration, non-discrimination, and *298 safety clause. (T-36-40; Finding #3.) The section of construction specifically covered by PKC under C11A1 ran underneath Atlantic Avenue from Kneeland to Congress Street in downtown Boston. (T-269; Finding #4.) Among other things, PKC’s contract involved slurry wall construction, utility relocation, excavation and construction of 2,000 liner feet of tunnel and the rehabilitation and support of the MBTA Red Line subway tunnel where it passes over the newly constructed expressway tunnels. (T-269; Finding #5.) PKC was also responsible for the construction of the MBTA Red Line “superstation” at South Station, adjacent to the project. (T-266; Finding #6.)
At the time of the alleged incidents, Greg Shaw was the general superintendent for PKC and was responsible for all operations under CHAI. (T-268.) Peter Buckjune was PKC’s general night superintendent for C11A1. (T-297.) At the time, Buckjune had over thirty years experience m construction, and as general night superintendent oversaw approximately 200 employees. (T-297; Finding #7.) During Buckjune’s thirty years in construction he never had a claim of sex discrimination made against him prior to this incident. (T-318.) Derek Hanson and Frank Nee were also employed by PKC and worked with Buckjune on the night shift as Assistant Superintendents. (Finding #7.)
Complainant, Mary Flaherty, a member of Laborers Local 223, first began working for PKC on C11A1 in September 1997 on the night shift. Flaherty was referred to the Project through Local 223’s hiring hall. (T-178; Finding #8.) When Flaherty first began working on the project, she was assigned to a utility relocation crew. In the late fall of 1997, a vacancy arose for a Maintenance of Traffic (MOT) truck driver. Buckjune, Derek Hanson and Frank Nee decided to assign Flaheriy as the night shift MOT truck driver. Flaherty did not have the requisite skills to make her valuable in the utility relocation, and was more skilled in the area of clean-up and sweeping the streets than as a skilled laborer. (T-301-04; Finding #9.)
One hour before the night shift began, Flaherty would report to PKC’s “laydown” area at C Street in South Boston, frequently referred to as the C Street yard. PKC used the C Street yard to store equipment and materials that could not be kept at the worksite in downtown Boston. When Flaherty reported for her shift she would pick up the MOT truck from the day shift driver, Frank Frederico. Pat Drummond, the male “yardman” in the C Street yard, assisted Flaherty in loading the MOT truck with barrels, cones and flashers. (T-306; Finding #11.)
As the night MOT driver, Flaherty’s main responsibility was to place traffic barrels and cones around the work zones being used by PKC work crews before the beginning of the night shift. Because the City of Boston would not allow PKC to close down certain busy parts of Boston until after rush hour, it was important for PKC to set up those work zones quickly, so that the night shift could begin immediately upon reporting to work. PKC expected that setting up work zones would take approximately one hour. Sometimes Buckjune would assign another laborer to assist Flaherty with setting up work zones. (T-307-308.) After setting up the work zones, Flaherty patrolled the work site to ensure that the work zones remained intact. If necessary, she would replace barrels. At the end of the shift, Flaherty would remove the barrels and cones from the work zones. (Finding #13.)
After Flaherty was moved to the MOT night shift driver position, Derek Hanson, the assistant PKC superintendent at night, observed that the work zones were sometimes not being set up in a timely manner. (T-251.) During this time, Buckjune also noticed that Flaherty was not completing her work in a timely manner. (T-305; Finding #14.)
Flaherty’s job required that both superintendents and foremen be in touch with her at all times, so they could contact her if a work zone needed to be moved, if more traffic control devices were needed or if damaged devices need to be replaced or repaired. (Finding #15.) For this purpose Flaherty was issued a two-way radio and one was installed in the MOT truck. Despite these radios, Buckjune and Hanson both claimed that on many occasions they and others could not locate Flaherty anywhere on the jobsite, and could not contact her on the radio. They claimed that she frequently would not respond to repeated radio calls. Flaherty claimed the radios were unreliable. (Finding #15.) In order to better monitor Flaherty’s whereabouts during the night shift, Buckjune, Hanson and Nee assigned her to work in the PKC tool room, which was located inside a building on Atlantic Avenue. To enter the building in which the tool room was located, employees had to enter an access code on a keypad padlock and it had an alarm system. Only Buckjune and Hanson had the keys for the padlock and the codes for the tool room alarm system. (T-316-317; Finding #20.)
After Flaherty set up the work zones, she would meet either Buckjune or Hanson at the tool room who would then open the room and de-activate the alarm for her. (Finding #21.) Flaherty’s job in the tool room was to deliver tools to workers on the site or check out tools for workers. If Flaherty had to deliver a tool to a worker or received a radio call to perform a duty with the MOT truck, she would padlock the room. When she returned she had to notify Buckjune or Hanson to let her back into the room. (Finding #22.)
Flaherty alleges that when she began driving the MOT truck, Peter Buckjune began harassing her and yelling at her in a manner that she considered degrading and sexist. She stated that he constantly yelled at her in front of others and humiliated her. She gave one example where she was talking to a policeman at South Station one evening when Buckjune drove up and yelled over a loudspeaker, “what the hell are you doing shooting the shit with the policeman.” She *299 claimed that both employees and pedestrians overheard this and that she was embarrassed. (T-200-201; Finding #16.) Other times Flaherty alleges that Buckjune would say things like, “never should have women in construction, damn women,” or would call her stupid in front of other employees. She stated that he would not treat men as harshly because they would “scream back at him and yell.” (T-205-208; Finding #17.)
Flaherty’s co-worker, Thomas Ward, testified that Buckjune called Flaherty a “dumb bitch” at one time. (T-108-138, 150; Finding #18.) Ward also stated that he thought Flaherty had too much responsibility and that Buclg'une was “always riding her” and that “he didn’t ride anybody else like that.” (T-109; Finding #18.)
Flaherty claims to have made numerous complaints to Buckjune about the MOT truck being in disrepair, and yet the repairs were not made. (T-194-196; Finding #19.) She further claims that the day shift driver who was male, used the same truck and that all repairs were made by PKC mechanics. (Finding #19.)
In late April 1998, during her shift, Buckjune discovered Flaherty asleep at the wheel of the MOT truck on Kneeland Street in a travel lane. Buckjune was patrolling the work site when he pulled up behind the MOT truck, and waited while the lights went through two red-green cycles. When Buclg'une approached the truck, he observed Flaherty sleeping, with her foot on the brake and the truck in gear. Buckjune reported the incident to the site safety office and the next day he reported the incident to Greg Shaw. (T-311-313; Finding #23.)
Two weeks later, Derek Hanson found Flaherty asleep at the wheel of the MOT truck at almost the same location. Again, Hanson could not raise Flaherty on the radio and so he began patrolling the work site in a pickup truck searching for her. While driving south on the Surface Artery, Hanson spotted the MOT truck sitting at a red light in the left-hand turn lane at the corner of the Surface Artery and Kneeland Street. Hanson waited behind her for three red-green cycles before approaching the truck. When he did so, he observed Flaherty asleep in the driver’s seat. At the end of the shift Hanson reported the incident to Buckjune and Greg Shaw. (T-252-255) (Finding #24).
The following day Shaw decided to terminate Flaherty and instructed the payroll office to prepare her termination check. (T-283) (Finding #26). Shaw gave Buclg'une the termination check. Buckjune in turn gave the termination check to Hanson and instructed him to terminate Flaherty. (T-314) (Finding #26). Hanson intercepted Flaherty at the beginning of her shift in the C Street yard, and notified her that she was terminated. (Finding #26.)
Shaw then informed Harold “Muggsy” Whitaker, the union steward for Laborers’ Local 223 on the project, about his decision. (Finding #27.) Shaw and Whitaker discussed Flaherty’s situation and decided to rescind the termination and to re-instate Flaherty for work in a different position on the day shift. (T-285) (Finding #28). In her new position Buckjune was not Flaherty’s supervisor, and her rate of pay and benefits remained the same. (T-229) (Finding #28).
Two days after beginning work on the day shift, Flaherty voluntarily left. Despite the fact that there were plentiful opportunities for work in construction, Flaherty chose to not go to the union hall to register for work. (Finding #29.) When Flaherty initially brought the charge of discrimination, she neglected to mention that after her termination, she was re-instated to a different position and voluntarily left. (Finding #29.)
Flaherty’s initial claim against PKC charged that Peter Buckjune harassed her and ultimately caused her termination because of her gender. The Hearing Officer found that Flaherty’s termination was lawfully founded in her potentially dangerous performance on the job site, and was not based on her sex. Therefore the only issue left is whether the harsh language Buckjune used in dealing with Flaherty was gender-based and discriminatory in nature.

DISCUSSION

G.L.c. 151B, §4(1) prohibits employment discrimination on the basis of gender. Gender-based discrimination is defined in G.L.c. 151B, §l(18)(b) as “such advances, requests or conduct that have the purpose or effect of unreasonably interfering with an individual’s work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. Discrimination on the basis of sex shall include, but not be limited to, sexual harassment.” There must be substantial evidence showing that a reasonable woman would “interpret the behavior complained of as offensive and an interference with full participation in the workplace.” Baldelli v. Town of Southborough Police Dept. 17 MDLR 1541 (1995). Moreover, it is not sufficient for the language to simply be coarse or profane in nature. As the Appeals Court of Massachusetts has noted, G.L.c. 151B is not a “clean language act.” Prader v. Leading Edge Products, Inc., 39 Mass.App.Ct. 616, 620 (1996). While there are times when “explicit sexually charged language alone constitutes harassment,” Id. at 619, that is only when the language consists of “sexual commands or lurid innuendos.” Id.
To determine whether or not there is substantial evidence to support the Hearing Officer’s decision, this Court must “examine the entirely of the administrative record and to take into account whatever in the record fairly detracts from the supporting evidence’s weight.” Cobble, supra, at 390. If this Court determines “that the cumulative weight of the evidence tends substantially toward an opposite inference, we reverse the agency’s decision.” Allen of Michigan, Inc. v. Deputy *300 Director of the Division of Employment & Training, 64 Mass.App.Ct. 370, 375 (2005). “The approach is one of judicial deference and restraint, but not abdication.” Amone v. Comm’r. of the Dept. of Soc. Serv., 43 Mass.App.Ct. 33, 34 (1997).
The language used by Buckjune in reference to Flaherty was not sufficiently sexually charged in nature to support the Commission’s decision. Buckjune’s comment: “What the hell are you doing shooting the shit with a policeman,” was not gender based. While it may have been embarrassing for Flaherty, there is nothing “explicitly sexual” about this comment, and all it shows is Buckjune’s frustration with Flaherty’s performance.
The Hearing Officer also relied on Flaherty’s testimony regarding the unspecified instances when Buckjune told Flaherty that “never should have women in construction, damn women.” The Hearing Officer relied on Flaherty’s testimony after she failed to disclose in her original charge that she had been re-instated to a different shift, and her misleading accounts of the two incidents when she was found sleeping in the truck. Similarly, the Hearing Officer relied on Ward’s testimony that on one occasion, Buckjune called Flaherty a “dumb bitch.” Assuming this testimony was true, while the remark may be disdainful, it is not “explicitly sexual” so as to constitute gender harassment under G.L. 15 IB. The evidence surrounding this matter strongly suggests that the comment was not charged by Flaherty’s gender, but again by Buckjune’s frustration with Flaherty’s poor performance.
Finally, the record shows that Buckjune yelled at Flaherty and used harsh language. This court does not find substantial evidence to show that the language Buckjune used was sexually charged in nature. To the contrary, the record shows that Buckjune yelled at and used harsh language with all the employees under his supervision. If Buckjune directed his comments more towards Flaherty than her male co-workers, the substantial evidence before us leads this Court to believe that it was not based on Flaherty’s gender, but the untimely and unsafe manner in which Flaherty performed her duties.[2]
This court does not find substantial support for the Hearing Officer’s decision that Buckjune subjected Flaherty to gender harassment while she was under his supervision. While it may be true that construction is a male-dominated field, where gender-based discrimination is a problem, and that it is the responsibility of the MCAD to vindicate the public on such discriminations, this is not the appropriate case to do so. There is substantial evidence in this case to show that while Buckjune may have been excessively abrasive towards Flaherty, it was not based on the fact that she was a woman, but simply on her poor performance and her inability to perform her job in a safe and timely manner, which led to an unsafe working environment for those around her.

ORDER

The plaintiff, Perini/Kiewit/Cashman’s Motion for Judgment on the Pleadings is ALLOWED. It is ORDERED that judgment shall enter vacating the Massachusetts Commission Against Discrimination’s decision to support a charge of gender-based discrimination against PKC. The cross-motions for judgment on the pleadings by the defendant, Mary Flaherty, and by the defendant, Massachusetts Commission Against Discrimination are DENIED.

Because this court finds that the MCAD decision is not supported by substantial evidence that the language and conduct of Buckjune was gender based and discriminatory in nature, the Court does not deal with the $15,000 in damages awarded for Ms. Flaherty’s emotional distress and the five years of training (presumably world-wide) of their respective employees.

Compare language alleged in Procter, supra, at 619, n.2 (‘The plaintiff complains that the supervisor referred to her as a “cocksucker” and “a fucking . . .”). The Court in Prader, id., acknowledged that the words used did have an “explicit sexual connotation” however “[h]er words amounted to no more than crass garden-variety expletives ...” [T]he ‘culture of profanity’ in existence at the defendant’s work place, although offensive to the plaintiff, simply was not a form of sexual harassment."